MARVIN LEROY LUND AND HELEN M. LUND, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4804–63, 4820–63, 1431–64, 1433–64, 1436–64,  Filed June 13, 1966. 1510–64, 2492–64.

*Lee N. Johnson* and *John F. Laue,* for the petitioners.
*S. Clay Freed,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

| Docket No. | Petitioners | Year | Adjustment to taxable income | Deficiency |
|---|---|---|---|---|
| 4804–63 | Marvin LeRoy and Helen M. Lund | 1960 | $987.00 | $95.00 |
|  |  | 1961 | 276.00 | 67.00 |
| 4820–63 | F. Alfred Roworth and Elizabeth F. Roworth | 1959 | 1,107.23 | 213.61 |
|  |  | 1960 | 920.18 | 172.49 |
| 1431–64 | Orin G. Spencer and Erma H. Spencer | 1960 | 291.72 | 64.18 |
|  |  | 1961 | 293.99 | 64.68 |
| 1433–64 | George A. Anderson and Esther L. Anderson | 1960 | 426.00 | 93.72 |
| 1436–64 | Earl S. Lunde and Corrine I. Lunde | 1962 | 686.24 | 172.81 |
| 1510–64 | Stephen A. Hanto and Josephine J. Hanto | 1960 | 924.96 | 203.49 |
| 2492–64 | Marvin E. McDonald and Margaret D. McDonald | 1960 | 624.00 | 161.86 |

All issues raised by the pleadings in all the cases have been disposed of by agreement of the parties except the issues relating to deductions for educational expenses claimed by one of petitioners in each case

---

[1] Proceedings of the following petitioners are consolidated herewith: F. Alfred Roworth and Elizabeth F. Roworth, docket No. 4820–63; Orin G. Spencer and Erma H. Spencer, docket No. 1431–64; George A. Anderson and Esther L. Anderson, docket No. 1433–64; Earl S. Lunde and Corrine I. Lunde, docket No. 1436–64; Stephen A. Hanto and Josephine J. Hanto, docket No. 1510–64; and Marvin E. McDonald and Margaret D. McDonald, docket No. 2492–64.

for each year involved therein under section 162(a) of the Internal Revenue Code of 1954.

The issue for decision is whether amounts expended by flight engineers employed by a commercial airline for training to qualify for commercial pilot's licenses and instrument ratings are deductible under section 162(a) as expenses incurred by an employee to maintain or improve skills required in his employment or to meet an express requirement of his employer for the retention of salary, status, or employment.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

The parties petitioners in each docket, husband and wife during the years involved, filed joint Federal income tax returns. Petitioners Lund, Roworth, and McDonald filed their returns for the years in issue with the district director of internal revenue at Tacoma, Wash. Petitioners Spencer, Anderson, Lunde, and Hanto filed their returns for the years in issue with the district director of internal revenue for the district of Minnesota.

The wife petitioners are involved only because they filed joint returns with their husbands. The term "petitioners" as used hereinafter refers to husband petitioners, unless the context indicates otherwise.

During the years here in issue, all petitioners were employed by Northwest Airlines, Inc. (hereinafter referred to as Northwest), as flight engineers.

Northwest is and at all times herein material has been a Minnesota corporation with its principal office and place of business in that State. Northwest is a common carrier by air engaged in interstate commerce subject to the provisions of the Railway Labor Act (45 U.S.C. sec. 151 *et seq.*). Northwest, as such common carrier by air, holds certificates of public convenience and necessity for principal domestic routes connecting the Pacific Northwest cities of Seattle, Tacoma, and Portland with Chicago, New York, Washington, and Miami via various intermediate points, among others, Chicago, Detroit, Milwaukee, and Minneapolis-St. Paul.

Petitioners have been employees of Northwest for many years. Each of them, except McDonald and Roworth, has been a duly qualified flight engineer, employed as such by Northwest since about 1950. McDonald has been so qualified and employed since 1953 and Roworth has been so qualified and employed since 1952. Each of petitioners was in the U.S. military service (most if not all of them during World War II) where he received his initial experience as an airplane mechanic or flying crew member. Each petitioner entered the employ

of Northwest as a mechanic soon after his discharge from military service and subsequently became a flight engineer.

A flight engineer is part of the flying crew of an airplane. Federal regulations require all common carriers by air engaged in interstate commerce to have on all aircraft of certain specifications one person holding a flight engineer's certificate.[2] The same regulations require the number of pilots consonant with safety. All of the airplanes flown by Northwest during the years here involved were subject to these regulations.

A flight engineer is essentially a mechanic or an engineer. He is not a pilot. He must have passed an examination administered by the Federal Government and have received a certificate as a flight engineer. Prerequisites to certification may be fulfilled by practical experience in maintenance and repair of aircraft and their engines and accessories, a degree in aeronautical engineering, or previous time in the air as a flight engineer.

The flight engineers of Northwest are represented in their labor negotiations by the International Association of Machinists (hereinafter referred to as IAM). A collective bargaining agreement, dated October 1, 1958, between Northwest and IAM, describes a flight engineer as an employee engaged in—

the work of assisting other flight crew members in successfully completing flights and who is responsible for the adjustment, operation, in-flight repair, and supervision of mechanical and engineering devices and parts aboard the aircraft in flight and, if necessary on the ground, and who by detection, anticipation and analysis of mechanical irregularity and by inspection of the aircraft before and during flight and through maintaining records relating to performance, recognizes and to the extent possible, corrects all malfunctions of the aircraft to which he may be assigned.

A pilot is one "who manipulates the flight controls of an aircraft while under way, including take-off and landing * * * and who * * * holds currently effective airman's certificates." The pilot, also, is licensed under the authority of the Federal Government. A commercial pilot's license permits the holder to fly for hire. The pilot in command of a commercial flight must have a commercial license known as an airline transport pilot certificate. A copilot, or pilot not in command, of a commercial flight must have a "commercial pilot certificate and instrument rating." An instrument rating permits the holder to operate an aircraft on instruments.

The functions of pilot and flight engineer are essentially separate and distinct. Qualification for one does not qualify for the other. The pilots of Northwest are represented in their labor negotiations with the company by the Air Line Pilots' Association (hereinafter referred to as ALPA).

---

[2] 14 C.F.R. sec. 41.73 (as amended to Apr. 15, 1955). Part 41 of 14 C.F.R. was subsequently rewritten on Jan. 1, 1965.

In the late 1950's turbine-powered aircraft began to come into use in commercial air transportation. Turbine-generated power may be employed to drive a propeller, or the straight jet thrust may be used. Prior to the advent of turbine-powered aircraft, commercial aircraft were piston-driven propeller planes. Northwest used DC–6 and DC–7 piston-driven propeller planes. In late 1959 it acquired some L 188 turbine-powered propeller planes referred to as prop jets and in 1960 began acquiring DC–8 jet planes of the jet thrust type. Northwest thereafter continued to acquire planes driven by jet thrust and to retire its propeller-driven planes. Northwest at the time of the trial of this case was using new "tri-jets," designated as 707's, 320's, and 727's. It had no DC–6 propeller planes still in use, only seven DC–7 propeller planes were still in use and only 18 "prop jet" planes. Jets only were being flown from Seattle.

The flight crews of piston-driven propeller planes were composed of two pilots (captain and copilot) and one flight engineer. Just prior to the introduction of jet-powered aircraft into service, the management of Northwest decided that the entire crew of jets should be "operationally oriented," which meant that each crew member should be a qualified pilot. Federal regulations continued to require one crew member to be a qualified flight engineer.

Pursuant to the decision of its management, Northwest issued a policy statement to all pilots and flight engineers on August 20, 1959. This statement referred to the "developments in the industry, recommendations resulting from a public hearing on the subject, and the advent of turbine-powered [jet] aircraft" and read, in part:

As the duties of all flight crew members are closely and substantially interrelated and in order to increase the coordination and efficiency of flight crew members in the performance of their duties, the Company has concluded that all flight crew members should receive initial and recurrent training which will assure an adequate operationally oriented flight crew. This program is being introduced in Electra [L 188] equipment training and will be extended to other aircraft as the need for further initial training develops.

The long-range objective of this program which will be conducted under the supervision of Flight Operations supervisory personnel is to have all training proceed under the concept that each flight crew member is being trained to relieve other flight crew members—the copilot to relieve the pilot-in-command under routine or emergency conditions and the third flight crew member, when pilot qualified, to relieve the copilot under routine and emergency conditions.

The Company has decided that safety considerations require that three flight crew members on DC–8, Boeing 707, Convair 880 and similar straight jet aircraft meet the requirements to carry out their assignments and meet the objectives of this program. Accordingly, in addition to a flight engineer's rating, the third flight crew member on such straight jet aircraft must possess a commercial license, an instrument rating and must meet such other minimum requirements as may be imposed by the Company, including the training required to assure operationally oriented flight crews.

The policy statement was followed on November 16, 1959, by a bulletin directed to all flight engineers, which read in part:

We presently expect the delivery of our first DC-8 aircraft in March, 1960. The flight crew training program for this aircraft will commence substantially ahead of the first delivery date.

In keeping with the announced operational crew concept and on the assumption that the ultimate crew on NWA straight jet aircraft will be composed of a crew of three, consisting of two pilots and a flight engineer, the company is imposing additional requirements on flight engineers to be assigned to such aircraft. Accordingly, flight engineers before being assigned to straight jet aircraft as part of a three man crew will be required to be in possession of a Commercial Pilot Certificate with an Instrument Rating. * * *

Prior to the adoption of the management decision as above set forth, a flight engineer on a Northwest flight, the third member of the crew, had no need for pilot training. He did not assist in the navigational operations of the airplane and was not expected to relieve either the copilot or pilot in either emergency or routine situations. The duties and responsibilities of a flight engineer were set out in the Northwest Manual as follows:

A. *Responsibilities of the Flight Engineer*

\* \* \* \* .\* \* \*

3. The Flight Engineer is responsible for assisting in the operation, maintenance and repair of the mechanical devices and parts of the airplane as may be required in flight and on the ground as is necessary; and for maintaining records relating to the performance and condition of the airplane in flight, and assisting in maintaining a safe and efficient condition of the airplane to which he is assigned.

B. *Basic Duties of the Flight Engineer*

1. The Flight Engineer shall report to the Operations office in sufficient time prior to the start of any scheduled flight to familiarize himself with the details pertaining to the flight.

2. Confer with the maintenance supervisor prior to departure to determine adequacy of the type of work performed and the repairs that have been made on the airplane.

3. Check as to the airworthiness and proper servicing of the airplane prior to departure by conducting a pre-flight examination of the airplane in accordance with a published check list.

4. Inform the Captain prior to departure, of the general operating conditions of the airplane.

5. During flight, operate such devices and controls as may be required or requested by the Captain of the airplane. When required by the Captain to meet an in-flight emergency, operate emergency controls and conduct emergency repairs except when otherwise ordered by the Captain.

6. Provide other crew members, upon request, information necessary as to engine settings and instrument readings and handle cockpit checks and engineer's desk duties in accordance with standard cockpit procedures and Captain's orders.

7. Determine the proper course of action to be taken in all matters pertaining to the mechanical operation, and to analyze, repair or service the airplane in the air, and on the ground where no maintenance supervisor is available. * * *

The decision of Northwest's management that the third crew member on jet aircraft should hold a commercial pilot's license and instrument rating was immediately protested by IAM. IAM contended that this decision violated the "integrity of the craft or class of flight engineers," in that it unilaterally imposed an added requirement on flight engineers contrary to the labor contract then in force. IAM contended that the requirement of flight training and the acquisition of commercial licenses would threaten the collective-bargaining status of flight engineers and, in turn, their seniority and other job rights. There ensued a three-way labor dispute among IAM, ALPA, and Northwest in which IAM resisted the imposition of the added requirement for flight engineers on jet craft lest it impair their job status, ALPA insisted there be three pilots in a jet crew, and Northwest sought a solution which would not require the use of a four-man crew.

During the first part of 1960, the parties negotiated unsuccessfully and negotiations terminated in late May. The existing collective-bargaining agreement between Northwest and IAM terminated on July 1, 1960.

On July 23, 1960, a new collective-bargaining agreement was entered into between Northwest and ALPA covering the employment of pilots but the status of the flight engineers represented by IAM remained unsettled for some time. For approximately 4 months after its agreement of July 23, 1960, with ALPA, Northwest flew its jets with a crew of four, three pilots, members of ALPA, and one flight engineer, a member of IAM. On October 10, 1960, the flight engineers represented by IAM struck against jet flights and no jets were flown by Northwest for 3 months. On January 10, 1961, Northwest put its jets back in service with a three-man crew, all of whom were pilots and members of ALPA. One of these pilots had been trained by Northwest as a flight engineer and had received the proper flight engineer's certificate. In retaliation, the flight engineers represented by IAM struck on all flights, thereby putting all Northwest's nonjet airplanes out of service. The flight engineers resumed service on nonjets after President Kennedy referred the stalemate to an emergency board on February 24, 1961. On May 24, 1961, the report to the President was filed by the emergency board. This report concluded that all three crew members on jet aircraft should hold pilots' licenses and instrument ratings and recommended that the training necessary to acquire these be given by Northwest to its flight engineers on company time and at company expense. Northwest unilaterally issued a policy statement on July 1, 1961, containing substantially the same provisions as the agreement with IAM which had expired a year earlier, to cover the status and working conditions of the noncontract flight engineers who were flying only on nonjets. This state of affairs continued until an agreement was reached between Northwest and IAM on July 12,

1963. Under this agreement provision was made for the transfer of flight engineers to service on jet airplanes without loss of seniority. Under the agreement it was necessary for a flight engineer who transferred to service on jet airplanes to qualify to pilot a plane and to be represented in labor negotiations with Northwest by ALPA rather than IAM. The Northwest–ALPA agreement of July 23, 1960, was still in effect.

The third position on jet aircraft was designated as second officer in the agreement of July 23, 1960, between Northwest and ALPA. While a four-man crew was being used from July 23 to October 10, 1960, the second officer was a pilot only, having no mechanical duties, and the fourth crew member was a qualified flight engineer only, having no piloting duties. Northwest desired to fill the position of second officer with a man who was qualified both as a flight engineer and a pilot in order to comply with the Government regulation requiring a flight engineer as a crew member on every flight and also follow its policy decision to have a third crew member who could pilot the plane if the necessity arose. The first two crew members on jet airplanes were the captain and copilot, as in the case of nonjet crews.

The ALPA agreement contained the following description of a second officer's responsibilities and duties:

2. Such second officer shall be qualified by the Company to provide relief at all required flight crew positions except that of pilot in command. Such qualifications shall include at least a commercial license, instrument rating, a flight engineer's certificate, and the ability to fly the aircraft.

3. The second officer shall perform such duties as are assigned to him by the Company and the pilot in command and which will include pilot duties in the following areas:

a. Assignments in pre-flight and in-flight planning, including weight and runway computations, temperature and winds aloft studies, et cetera.

b. Assignments in navigational, communication and air traffic control functions as required or assigned.

c. Assignments in systems' monitoring, fuel management, CG control, and efficient and economical management of the flight as required or assigned.

d. Maintenance of records and required paper work so as to relieve the operating crew currently performing flight duties of such paper work.

e. Relief of any flight crew member as may be required by routine or emergency conditions and during their absence from the flight deck.

The duties of a second officer are primarily mechanical in nature. A few of the duties performed by a second officer may be regarded as navigational in nature but they are quantitatively insignificant. Some of these were performed by petitioners when they were flight engineers although they were not then "required" to perform them. The second officer does not fly the airplane, although by training he is able to do so.

The second officer arrives at the plane before flight, acquaints himself with the idiosyncrasies of the craft, checks certain flight infor-

mation, inspects the plane physically inside and out, and monitors the various mechanical systems before takeoff. During flight, he continues to monitor systems and makes corrections and repairs as needed.

The management of Northwest did not expect in 1959 when its first jet airplanes were ordered that jet operating systems would be conducive to in-flight correction as were nonjet systems, but experience has proved otherwise, and the second officer performs the function of making in-flight corrections of the operating systems on jet aircraft. After flight the second officer logs pertinent information.

None of petitioners has, as a second officer, been required to fill in for a pilot, either routinely or in an emergency. Petitioners who are second officers do not pilot any plane regularly and frequently. A commercial license becomes invalidated by nonuse. To avoid this occurring a second officer will revalidate his commercial license by a few hours of practice in any plane.

An instrument rating, for which a flight engineer was required to qualify to be a second officer, permits the holder to operate an airplane on automatic controls, or the "Doppler system." The Doppler system was not used on nonjet aircraft. Second officers monitor the Doppler system when it is in use.

When petitioners received the policy statement and the bulletin from Northwest in August and November 1959, their reactions were similar. They each believed that the conversion to jet aircraft by Northwest was inevitable and that if they wanted to stay on the flight crews of Northwest they would have to obtain commercial licenses with instrument ratings. They each believed that if they did not obtain the required training for jet service, they would eventually be forced to revert to their former ground mechanics' positions. Ground mechanics earn approximately one-half the amount earned by flight engineers.

Petitioners continued to work as flight engineers during the continuance of the labor dispute but they also sought to qualify themselves for second officers' positions when these positions should become available to them. It was not feasible for petitioners to seek such positions before some agreement was reached between Northwest and IAM. Prior to such an agreement being reached petitioners would have been required to resign as flight engineers to seek employment as second officers. By resigning petitioners would have lost their seniority as flight engineers and would have been placed at the bottom of the pilots' seniority list, on which second officers were listed at that time. Petitioners were all in their late thirties or older in 1960. Because of their age, it would have been unlikely that Northwest would have reemployed them for placement on the bottom of the pilots' seniority list. The agreement of July 12, 1963, permitted flight engineers to become second officers without losing their status as flight engineers for 5 years, and provided that their time spent as flight engineers would be

counted in establishing their seniority status as second officers. By meeting the qualifications of second officer on jet aircraft, a flight engineer also met the qualifications prescribed by Northwest for copilot but did not thereby meet the qualifications for captain.

Petitioners were aware from personal experience and observation of the rapid technological changes in the airplane industry and the consequent, equally rapid obsolescence of planes in use.

In 1959 Northwest employed approximately 260 flight engineers. On January 1, 1965, Northwest employed only 90 flight engineers on propeller aircraft and at the time of the trial of this case it employed 75 to 77 flight engineers.

The seniority rank of each petitioner on the Master Flight Engineers' Roster on the dates indicated was:

| Name | Rank | | |
|------|------|------|------|
| | July 1, 1960 | Feb. 24, 1961 | Jan. 1, 1965 |
| Stephen A. Hanto | 1 | 1 | 1 |
| George A. Anderson | 3 | 3 | 3 |
| Orin G. Spencer | 42 | 42 | 38 |
| F. Alfred Roworth | 53 | 53 | 49 |
| Earl S. Lunde | 58 | 58 | 54 |
| Marvin E. McDonald | 66 | 66 | 61 |
| Marvin L. Lund | 86 | 86 | 80 |

Petitioners paid amounts for flight training in the years here in issue and received their certification on the dates as shown by the following schedule:

| Name | Year training expense paid | Amount paid | Date commercial license received | Date instrument rating received |
|------|------|------|------|------|
| Marvin LeRoy Lund | 1960 | $366.00 | | |
| | 1961 | 276.00 | Mar. 18, 1964 | Mar. 6, 1964. |
| F. Alfred Roworth | 1959 | 970.99 | | |
| | 1960 | 1,011.66 | 1960 | March 1961. |
| Orin G. Spencer | 1960 | 283.22 | | |
| | 1961 | 228.02 | Oct. 28, 1963 | Not shown. |
| George A. Anderson | 1960 | 190.80 | Feb. 25, 1964 | None. |
| Earl S. Lunde | 1962 | 442.38 | Apr. 28, 1962 | June 20, 1962. |
| Stephen A. Hanto | 1960 | 873.18 | Jan. 26, 1960 | June 23, 1960. |
| Marvin E. McDonald | 1960 | 354.00 | January 1964 | January 1964. |

After receiving their commercial licenses with instrument ratings, petitioners attended a copilot and second officers' training program given by Northwest. The second officers' training was for the purpose of familiarizing them with the specific planes on which they would be working.

Petitioners, except for McDonald, became second officers sometime after July 1963. McDonald at the date of the trial of this case was continuing to fly as a flight engineer on nonjet aircraft.

The salary scale of a flight engineer and that of a second officer varies with the nature of the flying assignment involved. Both flight engineers and second officers bid monthly for flying assignments and such assignments are made on the basis of seniority. The salary scales of a flight engineer and of a second officer flying on comparable assignments are substantially the same, but the salary scale of a copilot is substantially higher than the salary scale of a flight engineer or a second officer.

Each petitioner claimed as a deduction in each year here in issue the amount he expended in that year on flight training. Respondent disallowed the claimed deductions to each petitioner with the explanation that it had not been established that he was entitled to such deductions.

### ULTIMATE FACTS

Petitioners each undertook flight training for the primary purpose of meeting requirements established by their employer for second officers.

The position of second officer is not substantially different from nor a significant advance over the position of flight engineer.

### OPINION

Section 162 of the Internal Revenue Code of 1954 provides for the deduction of ordinary and necessary expenses paid or incurred in carrying on a trade or business. Where amounts are expended by a taxpayer for education undertaken for the purpose of improving skills required in his employment or meeting the express requirements of his employer imposed as a condition to the retention of his salary, status, or employment, such amounts are considered to be ordinary and necessary business expenses deductible under section 162.[3] Educational expenditures are not deductible if the education is undertaken primarily for the purpose of obtaining a new position or a substantial advancement in position.[4]

---

[3] Sec. 1.162–5(a) [Income Tax Regs.]. Expenditures made by a taxpayer for his education are deductible if they are for education (including research activities) undertaken primarily for the purpose of:
(1) Maintaining or improving skills required by the taxpayer in his employment or other trade or business, or
(2) Meeting the express requirements of a taxpayer's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the taxpayer of his salary, status or employment.

[4] Sec. 1.162–5(b) [Income Tax Regs.]. Expenditures made by a taxpayer for his education are not deductible if they are for education undertaken primarily for the purpose of obtaining a new position or substantial advancement in position, or primarily for the purpose of fulfilling the general educational aspirations or other personal purposes of the taxpayer. The fact that the education undertaken meets express requirements for the new position or substantial advancement in position will be an important factor indicating that the education is undertaken primarily for the purpose of obtaining such position or advancement, unless such education is required as a condition to the retention by the taxpayer of his present employment. * * *

The intent of a person in undertaking further education presents a question of fact to be determined from the evidence in the particular case. *Condit* v. *Commissioner*, 329 F. 2d 153 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court; and *Welsh* v. *United States*, 329 F. 2d 145 (C.A. 6, 1964).

In the instant case the evidence shows that petitioners undertook flight training in order to meet the requirements established by their employer for the position of second officer on jet airplanes. Respondent does not specifically contend to the contrary although he makes some argument based on the fact that since the same training would also qualify the petitioners here involved for the position of copilot, the primary purpose of petitioners' taking the training was to become copilots. From the evidence we conclude that in no instance was this the primary purpose of any petitioner in undertaking the training to obtain a commercial pilot's license and instrument rating. Under these circumstances the fact that the training might also serve to qualify petitioners for a copilot's position would not render the expenditures made to obtain the training nondeductible if the primary purpose for which they were made was such as to entitle petitioners to the deduction. *Cosimo A. Carlucci*, 37 T.C. 695 (1962), and *Laurie S. Robertson*, 37 T.C. 1153 (1962).

The crucial question here and the one to which the argument of the parties is primarily directed is whether the training for which the expenditures that petitioners seek to deduct were made, was undertaken by each of them to improve his skills as a flight engineer or to meet the express requirement of Northwest for retention of his position as a flight engineer. To answer this question, it is first necessary to determine whether the position of flight engineer on propeller aircraft was essentially the same as that of second officer on jet aircraft. We have, as set forth in our ultimate findings, concluded that the two positions were essentially the same. Having made this determination, the question remaining for decision is whether, within the meaning of respondent's regulations, training undertaken to obtain a commercial pilot's license and instrument rating improved skills required by each of petitioners in his employment as flight engineer or met the express requirement of his employer imposed as a condition to retention of his salary, status, or employment as a flight engineer.

Respondent emphasizes the fact that the skills of a flight engineer were those connected with the mechanical systems of the airplane and that petitioners did not improve these skills by learning to fly planes and obtaining instrument ratings. We do not interpret the provision of the regulation which refers to improving skills required by a taxpayer in his employment as limiting the deduction by a taxpayer to expenditures for education or training in areas identical to such taxpayer's prior training. As we held in *John S. Watson*, 31 T.C. 1014

(1959), it is not fatal to the allowance of a deduction that the amounts are paid for specialized courses if the purpose for which the courses are taken is to enhance existing skills and not to engage in a new specialty.

Under the facts of the instant case, even if the obtaining of pilots' licenses and instrument ratings could be considered not to improve petitioners' skills as flight engineers, it was training specifically required by Northwest if a flight engineer was to serve as second officer on a jet aircraft. Since we have concluded from the evidence that the position of second officer on jet aircraft was essentially the same as that of flight engineer on propeller aircraft, it follows that the education undertaken by petitioners was to meet a specific requirement of their employer as a condition to the retention of their employment if their employment required that they fly on jet aircraft. Petitioners at the time they took the training were not faced with the immediate possibility of loss of their positions. At that time Northwest was still flying a sufficient number of propeller aircraft that the seniority of each petitioner as a flight engineer was sufficient for him to retain his position serving on propeller planes. However, the facts here show that petitioners could have had no reasonable expectation of continuing indefinitely as a member of a flight crew without securing commercial pilots' licenses and instrument ratings. The facts show that the retirement of propeller aircraft was inevitable as jets were placed in service and that petitioners could reasonably anticipate the retirement of practically all propeller planes by Northwest many years before they would reach retirement age. It is not necessary that a taxpayer be threatened with immediate dismissal unless he takes certain training in order for the expenditures made for the training to be deductible. In *Robert F. Green*, 28 T.C. 1154 (1957), we considered expenditures made by a teacher during the first year of a 5-year period allowed for meeting educational requirements as well as those made at the end of the preceding 5-year period when he would have been unable to retain his status without acquiring additional credits to be deductible as ordinary and necessary business expenses.

Respondent points to the seniority of petitioners as flight engineers in arguing that there was no danger to any of them of loss of their positions, stating that as of January 1, 1965, Northwest still employed 90 flight engineers and no one of petitioners was below that level in seniority. The testimony shows that at the date of the trial of this case on June 29, 1965, Northwest was employing only 77 flight engineers. At least one of petitioners would have lost his position as flight engineer unless his seniority level had risen between January 1, 1965, and the end of June 1965 had he not qualified as a second officer. We conclude that it was necessary for petitioners to undertake the training to obtain commercial pilot's licenses and instrument ratings

in order to meet the express requirement of their employer as a condition to the retention of employment as a part of the flying crew.

Respondent attempts to equate the situation here with that in *Sandt* v. *Commissioner*, 303 F. 2d 111 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court; and *Joseph T. Booth III*, 35 T.C. 1144 (1961). Both of these cases are distinguishable on their facts. Each of these cases involved education undertaken to obtain a new position. In *Sandt* v. *Commissioner, supra*, a chemist attended law school in order to meet the requirement of his employer for the position of patent chemist even though he could have remained in his position as a research chemist without undertaking the additional education. In *Joseph Booth III, supra*, an attorney took training in tax law in order to form a new partnership association.

Respondent cites a number of cases involving certain aspects of the labor dispute between Northwest and IAM and ALPA, stating that these cases show that IAM took the position that a second officer on a jet aircraft was a different position from that of flight engineer. These cases, *International Ass'n of Mach.* v. *Northwest Airlines, Inc.*, 193 F. Supp. 781 (D. Minn. 1961); *Northwest Airlines, Inc.* v. *International Ass'n of Mach*, 185 F. Supp. 129 (D. Minn. 1960); *Northwest Airlines, Inc.* v. *Airline Pilots Association*, 185 F. Supp. 77 (D. Minn. 1960); and *Northwest Airlines, Inc.* v. *International Ass'n of Mach.*, 178 F. Supp. 825 (D. Minn. 1959), all involved only Northwest and the two unions. Petitioners are not bound by any positions taken by the unions in those cases. Furthermore, the position that the IAM was taking was as stated in *Northwest Airlines, Inc.* v. *International Ass'n of Mach.*, 185 F. Supp. 129 (D. Minn. 1960), that Northwest was placing on the flight engineers a requirement which was a major departure from their past work responsibility. The court stated in this respect:

The plaintiff desires to qualify the engineers for a commercial pilot's certificate and instrument rating.

The defendants claim that this effort by plaintiff is a major departure from their past work responsibilities, and in effect, will abolish the flight engineers as a class and involuntarily merge their group with the pilots' association with consequent loss of seniority and other benefits. * * *

This is more of a contention that changes are being made in requirements for flight engineers than a contention that the position of second officer is a different position from that of flight engineer.

The evidence shows that under Federal regulations all planes, both propeller and jet, were required at all times here pertinent to carry as one of the flight crew a person holding a flight engineer's certificate. The testimony shows that the duties of both a flight engineer on propeller planes and a second officer on jet planes consisted of checking the planes for any mechanical defects or any problem with the plane's mechanism before takeoff, operation of all the mechanical

devices on the plane during flight, and repair during flight of any mechanism which needed repair. The mechanisms on the propeller planes were somewhat different from those on the jet planes, and there were certain mechanisms on the jet planes that were not on the propeller planes at all, but the work performed by the flight engineers and the second officers in operating these mechanisms was the same.

The testimony shows that the second officer was required to be available to do certain functions on a jet plane that the flight engineer was not required to be available to perform on a propeller plane. It was the safety precaution of having a third person available to perform these functions on a jet airplane that caused Northwest to insist that the second officer be trained to perform these functions. The testimony shows that none of petitioners has ever been called upon to perform any of the flight functions when flying as a second officer. From the testimony it appears unlikely that the second officer would be called upon to perform any of the flight functions that Northwest deemed as a precautionary measure he should be equipped to perform unless the captain or the copilot became incapacitated during flight. The job description stated that the second officer might be required to perform these as a routine matter but as a practical matter in the operation of the plane he was not required to perform any pilot functions. The second officer on a jet airplane performed the same type of functions, somewhat extended because of more complicated mechanisms being on jet airplanes, that the flight engineer performed on a propeller plane.

On the basis of the facts here, we conclude that petitioners are entitled to the claimed deductions for educational expenses since the education for which the amounts were expended was undertaken primarily for the purpose of improving the skills required by petitioners in their employment and also was undertaken to meet the express requirement of their employer as a condition to their retention of their status and employment.

*Decisions will be entered under Rule 50.*